# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRENDA K. SHEARER, | : | CASE NO. 3:12-cv-02120-GBC |
| | : | |
| Plaintiff, | : | (MAGISTRATE JUDGE COHN) |
| | : | |
| v. | : | MEMORANDUM TO DENY PLAINTIFF'S |
| | : | APPEAL |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF | : | Docs. 8,11,12,16 |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM TO DENY PLAINTIFF'S APPEAL

### I. Procedural History

On May 12, 2010 and May 14, 2010, Brenda K. Shearer ("Plaintiff") protectively filed an application for Title II Social Security Disability benefits ("DIB"), and also filed a Title XVI application for Supplemental Security Income ("SSI"), with an onset date of September 16, 2009. (Tr. 156, 158).

This application was denied, and on November 17, 2011 and January 31, 2012, a hearing was

held before an Administrative Law Judge ("ALJ"), where Plaintiff testified and waived the right to counsel. (Tr. 41, 59). On February 6, 2012, the ALJ issued a decision finding that Plaintiff was not entitled to DIB or SSI because Plaintiff could perform less than a full range of unskilled light work with extra breaks and only occasional interaction with the public (Tr. 31). On September 20, 2012, the Appeals Council denied Plaintiff's request for review, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1).

On October 26, 2012, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. §§ 405(g); 1383(c)(3), to appeal the decision of the Commissioner of the Social Security Administration denying social security benefits. Doc. 1. On March 8, 2013, Commissioner filed an answer and administrative transcript of proceedings. Docs. 7,8. In May and June 2013, the parties filed briefs in support. Docs. 11,12. On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge. On May 13, 2014, the Court issued an order providing Plaintiff the opportunity to file a reply brief and notifying the parties of the option to consent to Magistrate Judge jurisdiction. Doc. 13. On May 21, 2014, the parties consented to Magistrate Judge jurisdiction. Doc. 14. On June 3, 2014. Plaintiff filed a reply brief in accordance with the Court's order. Doc. 16.

## II.    Standard of Review

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564 (1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999); Johnson, 529 F.3d at 200.

This is a deferential standard of review. <u>See Jones v. Barnhart</u>, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more than a mere scintilla" of evidence. <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999). It may be less than a preponderance. <u>Jones</u>, 364 F.3d at 503. Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986).

To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

Moreover, the Act requires further that a claimant for disability benefits must show that he has a physical or mental impairment of such a severity that: "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

//

//

//

### III. Relevant Facts in the Record

### A. Background

Plaintiff is a forty-six year old female who was forty-four years old at the time of the first hearing which is classified as a younger individual (20 C.F.R. § 404.1563). Plaintiff has a high school education (Tr. 34) and past relevant work as a pharmacy technician, classified as semi-skilled and light with the skills being filling prescriptions, typing labels, working with customers, processing records and taking calls (Tr. 49).

At the first hearing in this matter, the ALJ reviewed the medical evidence on file, and asked Plaintiff whether she had other medical treatment and where so that the ALJ could obtain that information (Tr. 61-65). The ALJ further discussed Plaintiff's medications, medical conditions, and medical treatment extensively with Plaintiff, and asked Plaintiff to describe a typical day (Tr. 87-93).

The Administrative Law Judge found the Plaintiff had severe impairments of Restless Leg Syndrome and Depression but her High Blood Pressure, Cervical Nelgalasia, Gastroesophageal Reflux Disease and Obstructive Sleep Apnea were found to be non-severe (Tr. 28-29).

### B. Relevant Medical Evidence

### 1. Treatment with Sadler Health Center

Plaintiff obtained primary healthcare treatment with Sadler Health Center in 2010 and 2011 (Tr. 361-86, 637-745). In May 2010, Plaintiff was assessed, in pertinent part, with depression and prescribed Prozac (Tr. 377, 382). By June 2010, Plaintiff reported that Prozac was "helping 50-60%" but that she was still having trouble sleeping due to restless leg syndrome (Tr. 665).

Plaintiff was assessed with crepitus and knee pain in both knees in June, 2010 (Tr. 664). June 2010 x-rays of Plaintiff's left knee revealed no fracture or other abnormality in the bone, joint, or

soft tissue, and no effusion (Tr. 682). In July 2010, nursing staff assessed Plaintiff with chondromalacia patella of the left knee2 and Plaintiff was referred to physical therapy at the Drayer Physical Therapy Institute for knee pain (Tr. 658-59, 742-44, 746-49). In August 2010, however, Plaintiff's physical therapist contacted Sadler, reporting that objective findings did not support Plaintiff's reporting of 10/10 pain (Tr. 666). The physical therapist noted that "[Plaintiff] doesn't grimace, or limp, and is able to perform [activities of daily living] [without] difficulty. [Plaintiff] appears okay when [she] is unaware of being observed" (Tr. 666).

In an October 2010 treatment note, Plaintiff's physical therapist again noted that "[Plaintiff] would benefit from [follow up] at this time as objective measures are inconsistent [with] subjective complaints" (Tr. 742). In addition, Plaintiff had met most of her objectively tested physical therapy goals by October 2010 (Tr. 743).

Plaintiff sought paperwork to support her disability claim in August 2011 (Tr. 639, 641). Her gait and station, range of motion, stability, and muscle strength and tone were assessed as normal (Tr. 639). Louis Hieb, D.O., noted that he was not certain Plaintiff had cervical cancer, and that she reported she was doing "fairly well" with regard to her bipolar disorder (Tr. 641). Dr. Hieb's examination revealed that Plaintiff was in no acute distress, had no tenderness in her left calf, but was tender in her left Achilles tendon, and malleoli, and had pitting edema around the left ankle (Tr. 641).

### 2. Restless Leg Treatment with Salim Qazizadeh, M.D.

Plaintiff treated with Salim Qazizadeh, M.D., for her restless leg syndrome beginning in December 2010 (Tr. 425). Dr. Qazizadeh also referred Plaintiff for sleep studies, which she underwent in January 2011 (Tr. 702-37), and which revealed that Plaintiff had obstructive sleep

apnea, however, Plaintiff's apnea responded well to CPAP therapy, resulting in her sleeping better (Tr. 421-24). During a May 2011 examination, Dr. Qazizadeh found that Plaintiff was in no apparent distress, was awake, alert, and oriented, and had normal language, attention span, concentration, and memory (Tr. 422). Based on blood tests, Dr. Qazizadeh opined that Plaintiff's fatigue and restless leg syndrome (in part) related to her low ferritin, and vitamins D, B-12 and folic acid levels (Tr. 422, 427-28). Dr. Qazizadeh increased Plaintiff's Requip dosage to address her restless leg syndrome and strongly recommended that she stop smoking (Tr. 422).

### 3. Medical Source Statement of Robert Goeltsch, M.D.

Robert Goeltsch, M.D., opined in June 2010 that Plaintiff had no limitation with regard to lifting or carrying, standing and walking, sitting, or pushing or pulling (Tr. 341). He further opined that Plaintiff had no postural limitations, other physical function limitations, or environmental restrictions (Tr. 342).

### 4. Mental Health Treatment with Franklin Family Services

Plaintiff saw Kim Cuff, M.Ed., and psychiatrist J. Scott Trayer, D.O., for psychological treatment at Franklin Family Services from August 2010 to June 2012 (Tr. 477-532, 534-56, 563-634, 780-813). At Plaintiff's initial assessment in August 2010, a mental status examination revealed that she had a normal appearance, clear speech, normal affect, and good mood (Tr. 489). Plaintiff's thought process and content were clear, her orientation was good, and her intelligence was average (Tr. 489). Plaintiff's concentration, judgment, and insight were good (Tr. 489). She reported that she had a boyfriend (Tr. 489). Ms. Cuff assessed Plaintiff with depressive disorder, not otherwise specified (diagnostic code 311.00), and assigned a GAF score of 70 (Tr. 490).

In November 2010, Kim Cuff, M.Ed., assessed Plaintiff with current and prior GAF scores

of 70, an assessment that Dr. Trayer agreed with (Tr. 478, 603-04). During a January 2011 examination Dr. Trayer noted that Plaintiff's mood was euthymic, and that Plaintiff reported her mood being "good" (Tr. 491). Plaintiff's affect was appropriate, her speech was spontaneous, thought process was clear and appropriate, associative thinking was intact, and Plaintiff had no delusions, hallucinations, obsessions, preoccupations, or somatic thoughts (Tr. 491). Dr. Trayer further assessed Plaintiff's memory, attention span, concentration, judgment, and insight as intact (Tr. 491). Plaintiff's sleep was assessed as normal (Tr. 491).

In January and late February 2011, Dr. Trayer assessed Plaintiff with unimpaired speech, clear and appropriate thought process, and intact associative thinking (Tr. 520, 535, 537). He further assessed that Plaintiff's memory, attention span, concentration, judgment, and insight were intact (Tr. 520, 535, 537).

In a February 2011 session, Ms. Cuff noted that "[Plaintiff's] romantic relationship appears to be going well," that Plaintiff was a "mother figure" to her boyfriend's adult son, working with him on a daily basis, and that Plaintiff spent time with a small circle of relatives, thus reducing her anxiety and stress (Tr. 504). Ms. Cuff also noted that Plaintiff made arts and crafts daily (Tr. 504). Ms. Cuff assessed Plaintiff's anxiety, mood and attention at a level "8," but at the following session noted improvement, with mood at "4," and anxiety and attention at "3" (Tr. 504-05).[1] Ms. Cuff's assessments of Plaintiff fluctuated over March and April 2011, ranging from scores of 4 to 10 in the various categories of assessment (Tr. 506-08).

By late March 2011, Dr. Trayer assessed Plaintiff with a GAF score of 58, and again found

---

[1] Later records indicate a similar rating system from "1" to "7" with "7" indicating "significant concern/issue" and "1" indicating "no concern/issue" (Tr. 522).

that her memory, attention span, concentration, judgment, and insight were grossly intact, that her

speech was normal, and that her thought process was clear and appropriate (Tr. 518). During a

contemporaneous therapy session, Plaintiff reported that she was essentially acting as live in nursing

staff for her stepson and his biological father, taking care of both men (Tr. 595). Ms. Cuff assessed

Plaintiff's mood, anxiety, and attention at "9" (Tr. 595).

In an April 2011 treatment plan, Ms. Cuff noted that Plaintiff had achieved some of her

treatment goals and was continuing to work on others; under strengths, Ms. Cuff noted that Plaintiff

made friends easily, had a sense of humor, a positive attitude, positive parenting skills, got along

with her family and had age appropriate social interests (Tr. 480, 530). During April 2011 treatment

sessions, Ms. Cuff assessed Plaintiff with a 3 in attention level, 4 in her anxiety level, and 5 and 9

in her mood level (Tr. 531). She also noted that Plaintiff "continues to take care of her son on a daily

basis" and that "[Plaintiff] is doing a great job taking care of him" (Tr. 531-32). Ms. Cuff noted in

May 2011 that Plaintiff was doing well after having major oral surgery, and assessed her mood,

anxiety and attention at level 5 (Tr. 529). Plaintiff's diagnoses were bipolar disorder and depressive

disorder not elsewhere specified (Tr. 482). By May 2011, Dr. Trayer assessed Plaintiff's mood as

fair / okay, with a serious affect (Tr. 493). Plaintiff's speech was normal, and her memory, attention

span, judgment, and insight were all intact (Tr. 493). Dr. Trayer diagnosed Plaintiff with bipolar

disorder and assigned Plaintiff a GAF score of 58 (Tr. 493).

During a June 2, 2011 assessment, Ms. Cuff noted that Plaintiff had been "doing much

better" with her anxiety and depression, stating "[Plaintiff's] depression is associated mainly with

lack of money and not knowing when her SSI will come through" (Tr. 495). Although Plaintiff's

anxiety increased by her next visit (Tr. 497), it improved again later that month, assessed along with

Plaintiff's mood, and attention span at a 4 (Tr. 496). Ms. Cuff again noted that Plaintiff was "down because of her SSI not coming through" but that Plaintiff's mood was otherwise "good" (Tr. 496). By the end of June 2011, Plaintiff was again assessed with 4s in all categories, and Ms. Cuff noted that Plaintiff was doing very well managing her stress and anxiety (Tr. 498). On June 20, 2011, Dr. Trayer assessed Plaintiff's thought process as clear and appropriate, with intact associative thinking, memory, attention span, concentration, judgment, and insight (Tr. 516). Dr. Trayer assigned a GAF score of 62 at that time (Tr. 516).

In July 2011, Ms. Cuff's assessment scores fluctuated from 7s to 3s (Tr. 500, 577). Dr. Trayer examined Plaintiff in July 2011, and assessed Plaintiff's thought process as clear and appropriate, her associative thinking as intact, her memory, attention span, and concentration intact, and her speech as normal (Tr. 514). Plaintiff's judgment was assessed as fair and impulsive and Dr. Trayer assigned her a GAF score of 60 (Tr. 514).

By early August 2011, Ms. Cuff described Plaintiff's mood as "upbeat," stating that Plaintiff "continues to do well and achieve her treatment plan goals and three objectives" but rating her mood and anxiety at 7, and her attention at 3 (Tr. 499). She assessed Plaintiff with 6s at the following session, and 2s through 7s in the various categories throughout August and September 2011 sessions (Tr. 501, 525-28). In mid-August and September, 2011, Dr. Trayer opined that Plaintiff's memory, attention span, and concentration were intact and that she had a clear and appropriate thought process, and unimpaired speech; he found that Plaintiff's judgment was fair and impulsive, and her insight was limited (Tr. 509, 512). In August, Dr. Trayer assessed Plaintiff a GAF score of 62 and, in September he assessed a GAF score of 58 (Tr. 509).

In an October 2011 treatment plan, Ms. Cuff noted that Plaintiff and her companion took care

of Plaintiff's stepson's medical needs, which involved 24-hour per day care (Tr. 483). At that time, Ms. Cuff assigned Plaintiff a GAF score of 40 7 (Tr. 485). Later that month, an examination of Plaintiff by Dr. Trayer revealed that Plaintiff's mood was good and sad, her thought process was clear and appropriate, and her memory, attention span, concentration, judgment, and insight were intact (Tr. 502, 550). Plaintiff reported to Dr. Trayer that she was sleeping well with Gabapentin and, although she had some restless leg, she had less leg pain (Tr. 550). Dr. Trayer assigned Plaintiff a GAF score of 60 (Tr. 502, 550).

During November 2011 sessions, Ms. Cuff again attributed Plaintiff's stress to the fact that she had "not received her SSI checks yet" and assessed her mood, anxiety, and attention at "7" (Tr. 522-23). She also noted that Plaintiff was the full time care giver of her son (Tr. 523). Ms. Cuff assessed Plaintiff's mood, anxiety and attention at 6s and 7s throughout November and December 2011 (Tr. 563-65, 794).

In February 2012 sessions, Ms. Cuff assessed Plaintiff as severely depressed and anxious, rating her mood, attention and anxiety levels at 7 (Tr. 791-93). In her treatment plan, Ms. Cuff assigned a GAF score of 35 to Plaintiff, noting that she was still caring for her son and companion "24/7" but stating that Plaintiff could make friends easily, was articulate and had a sense of humor, was motivated to improve, and had a positive attitude (Tr. 801-03). By March 2012, Plaintiff reported that she was still caring for her stepson, which was "great" as it promoted her moving around and being "mobile throughout the day" (Tr. 789) and her primary stressors were financial (Tr. 788-89). Plaintiff's mood ranged from 6 to 7 during this time, and anxiety was rated at 7, with scores of 7 in April as well (Tr. 787-89). By early May, Plaintiff's mood and anxiety assessment had improved to scores of 5 and her attention was assessed at 4, with Ms. Cuff noting that Plaintiff was

fishing to relax (Tr. 786). Ms. Cuff's assessment of Plaintiff's mood and anxiety fluctuated from May through July, with Ms. Cuff noting the primary stressor for Plaintiff was not receiving SSI benefits and having financial difficulties (Tr. 780-85).

In June of 2012, Dr. Trayer examined Plaintiff, noting that she reported her mood as good and sad, and assessing her with a brighter but calm affect (Tr. 812). Dr. Trayer opined that Plaintiff's thought process was clear and appropriate, and that her associative thinking was intact (Tr. 812). As with prior examinations, Dr. Trayer assessed Plaintiff's memory, attention span, judgment and insight as intact (Tr. 812). He assigned Plaintiff a GAF score of 62 (Tr. 812).

Ms. Cuff submitted a medical source statement dated August 1, 2012, where she assessed Plaintiff with extreme limitations in every assessment category (Tr. 776-78). In her statement Ms. Cuff assigned a GAF score of 35 to Plaintiff (Tr. 776).

### 5. Consultative Evaluation with Christopher Royer, Psy. D.

Plaintiff attended a psychological consultative evaluation with Christopher Royer, Psy. D., in July 2010 (Tr. 391-94). Plaintiff reported periods of depression and that she was taking Prozac to deal with this (Tr. 392). Plaintiff reported being up three to four times per night due to her restless leg syndrome when she takes medication, and more if she does not (Tr. 392). Plaintiff was fully alert throughout the evaluation (Tr. 393). Her expressive speech was assessed as fluent and slow in pace (Tr. 393).

Dr. Royer assessed Plaintiff's thought processes as clear, associations as appropriate, and judgment as fair (Tr. 393). Plaintiff exhibited no perceptual disturbances or other gross psychopathology (Tr. 393). Plaintiff's mental status examination revealed that she was fully oriented (Tr. 393). Her ability to learn and recall a list of four words over a brief delay was mildly impaired,

but she performed a mental arithmetic test without error as well as a serial three test (Tr. 393). Plaintiff could comprehend and follow all test instructions (Tr. 393). Dr. Royer assessed Plaintiff's fund of information as adequate, and her affect as flat (Tr. 394).

Dr. Royer's diagnostic impression was that Plaintiff had major depressive disorder, moderate, recurrent; he assessed a GAF score of 52 (Tr. 394). In his functional assessment of Plaintiff, Dr. Royer opined that Plaintiff had no restriction in understanding, remembering, and carrying out short, simple instructions, and moderate limitation in doing so with regard to detailed instructions (Tr. 389). Dr. Royer opined that Plaintiff was moderately restricted in making judgments on simple, work-related decisions, and interacting appropriately with coworkers (Tr. 389). He found Plaintiff was slightly restricted in interacting appropriately with supervisors, and markedly restricted in responding appropriately to pressures and changes in a routine work setting (Tr. 389).

### 6. State Agency Psychological Assessment

State Agency expert psychologist Michael Suminski, Ph.D., reviewed Plaintiff's medical history, assessing Plaintiff's mental functional abilities (Tr. 402-05). Dr. Suminski opined that Plaintiff could "meet the basic mental demands of simple routine work on a sustained basis despite the limitations resulting from her [mental] impairment" (Tr. 405). Although he noted that Plaintiff was limited in remembering complex or detailed instructions, he opined that she could understand and remember simple one- and two-step instructions and could perform simple, routine, repetitive work in a stable environment, make simple decisions, and had adequate impulse control (Tr. 402, 404).

In terms of specific functional abilities, Dr. Suminski opined that Plaintiff was not significantly limited in nearly every subcategory of social interaction and adaptation, but that she was moderately limited in her abilities to interact appropriately with the general public, and respond

appropriately to changes in the work setting (Tr. 403).

## IV.    Review of ALJ Decision

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §§ 404.1520, 416.920; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that she is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

//

//

//

//

### A.   Plaintiff Allegations of Error

### 1.   ALJ Development of the Record

Plaintiff first argues the ALJ erred by failing to develop the record since Plaintiff waived her

right to an attorney at the hearing. (Pl.'s Br. at 8-10).

At the November 17, 2011 hearing, the following testimony transpired:

"ALJ:          . . . Now let's talk about your representation, ma'am, as you know because we've

sent you this information more than once you have a right to be represented. When

you first filed your Request for Hearing we sent you information about individuals

that might represent you for little or no fee. We gave you a list of names and

addresses. Did you understand you had a right to represent yourself, ma'am?

CLMT:          Um-hum.

ALJ:          Yes?

CLMT:          I do.

ALJ:          Do you wish to go forward on your own representing yourself today?

CLMT:          Yes.

ALJ:          I'll show you waived your Right to Representation today, November 17th, 2011."

(Tr. 65-66).

An ALJ has a duty to assist a pro se claimant in developing the record; however, "[she] is not

required to act as claimant's counsel." Haley v. Barnhart, 2003 WL 22053438, at *3 (E.D. Pa. June

23, 2003) (citing Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994)). Further, "the ALJ has a duty

to develop the record, but that duty only arises when there is insufficient evidence to make a rational

decision." Id. It is a claimant who bears the burden of production and proof in order to show that she

is disabled. See 20 C.F.R. §§ 404.1512, 416.912.

Plaintiff alleges that the ALJ failed to assume a more heightened level of care with regard to developing the record, given that she was not represented by counsel (Pl.'s Br. at 8). <u>See</u> <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979) (holding that an ALJ has a heightened duty of care with regard to developing the record when the claimant is unrepresented). Nevertheless, the ALJ still fulfilled her duty of ensuring the record was fully and fairly developed.

To properly develop the record, the ALJ (1) discussed Plaintiff's medical treatment at length with her to obtain information to gather the appropriate medical records at the first hearing (Tr. 61-65, 90-96); (2) obtained a consultative psychological examination of Plaintiff to further assess her mental functional abilities (Tr. 391-94); (3) held a second hearing, such that Plaintiff and the Agency had more time to obtain further medical evidence in support of Plaintiff's claim (Tr. 41-58, 95-96); and (4) obtained further medical evidence between the first and second hearings, including the entirety of Plaintiff's mental health treatment history (Tr. 63-65, 477-532, 534-556, 563-634). In light of the over 500 pages of medical evidence – including a consultative psychological examination and state disability medical expert analysis – and the testimony elicited regarding Plaintiff's daily functioning, the ALJ more than adequately developed the record, and undeniably had a rational basis to make her decision.

Plaintiff contends that the ALJ should not have stated they were "working together as a team." Pl. Br. at 10, Doc. 11. However, from the November 17, 2011 hearing testimony it appears the ALJ only made this statement in reference to clarifying medical history and records.

"ALJ:        . . . Do you believe that you're able to work eight hours a day on a sustained and continuing basis? And if not, why not? It's eight hours a day, five days a week, do you think you could do that?

CLMT:    No.

ALJ:        Why not, tell me that?

CLMT:       Not like the way I am, like right now I mean. It would be a little hard trying to work and all of a sudden you just start bawling or laughing --

ALJ:        So, so the crying?

CLMT:       -- literally screaming the next.

ALJ:        Okay. How long, I forgot and I can't find my notes and it would take me too long. How long have you been seeing the therapist, ma'am?

CLMT:       September of last year, of 2010?

ALJ:        You hadn't had mental health treatment prior to that? In other words you said you became disabled September of 2009 but you didn't begin treatment, continuing treatment for mental health until September 2010, is that right?

CLMT:       Right. Now I had it before but years ago.

ALJ:        Okay. But in the time frame that we have you and I together?

CLMT:       Right.

ALJ:        Working together as a team, okay. All right, from my perspective it seems that your medical record is going to change, not, it's not going to go back to September 2009. I, if you're correct and the records come in and show me it looks like your, your record will change. In other words, like your record will have changed instead of September 2009, September 2010. Does that sound right?

CLMT:       Okay.

ALJ:        We just talked about that, does that sound right, that's when you started the, the treatment, the mental health kind of thing?

CLMT:       Um-hum.

ALJ:        Okay. Now I want to get this information in unless I can make a decision it goes all

the way back to 2009. I'm going to send the information I gather to you and it's going

to come in a letter, the letter's going to say it's just something else you wanted the

Judge to know, do you want to talk about this. So some of this you're going to see

for the first time. It also might be instead but I'd look at it and say I have to ask more

questions, that's possible. But I'm going to gather all this information for you. Do

you have any questions about what's going to happen now?

CLMT:       No, ma'am.

ALJ:        I'm going to request the information. You're going to contact Dr. Goldtz, tell him the

Judge needs it. You have the Notice of Hearing from me, right?

CLMT:       Um-hum.

ALJ:        You know where I have to have that information, you tell them I need it, you know,

set up an appointment, get it done as quickly as possible, it's very important. And you

promised me that you'll do that then?

CLMT:       Yeah.

ALJ:        Okay. Then that's all I have today. I'm going to go ahead and do this for you, I think

you've done your best. I'm hoping that we, when we gather this information together

that we'll have a decision that we can make. Sound good?

CLMT:       Okay.

ALJ:        Have any questions?

CLMT:       No, ma'am."

(Tr. 94-96).

     Moreover, Plaintiff has been represented by counsel since July 2012, and she has not

submitted any additional evidence and she does she argue that any such evidence exists, either at the Appeals Council level, or to this Court (Tr. 7, 18, 20). Thus, the ALJ adequately developed the record.

Furthermore, even assuming Plaintiff had not made a knowing and intelligent waiver of counsel, she has not shown how her lack of attorney representation prejudiced her case. Mere lack of counsel is not sufficient, in itself, to justify a remand. Remand is only warranted where the lack of counsel prejudices a claimant or where the lack of counsel leads to an administrative proceeding marked by unfairness. Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980). That is not the case here.

"Because of the inquisitorial nature of Social Security proceedings, it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Carmichael, 104 F. App'x at 805 (citing Sims v. Apfel, 530 U.S. 103, 111 (2000)). "Such reasoning is further supported by the fact that a large portion of Social Security disability benefits claimants either have no representation at all or are represented by non-attorneys." Carmichael, 104 F. App'x at 805 (citing Sims, 530 U.S at 111 (2000)). In this case, the ALJ appropriately developed the record. He elicited testimony from Plaintiff regarding her subjective complaints, daily activities, and treatment with her doctors. The ALJ's examination of the vocational expert developed favorable evidence both for and against granting benefits. Additionally, the ALJ kept the record open so that Plaintiff could submit additional medical records and offered to obtain those records to make it easier on Plaintiff's representative. The ALJ fulfilled his duty to fully develop the record." See Clapper v. Colvin, No. 12–1688, 2013 WL 6191139, at *8-9 (W.D. Pa. Nov. 26, 2013).

**2.     ALJ Residual Functional Capacity Finding and Question to Vocational Expert**

Plaintiff contends the ALJ erred in determining Plaintiff's residual functional capacity and

question to the vocational expert by failing to include Dr. Royer's limitations of a marked restriction in interacting appropriately with the public and responding appropriately to work pressures or changes in a routine or usual work setting (Tr. 389); Kim Cuff's extreme restriction in understanding, remembering and carrying out short, simple instructions, making judgments on simple work related decisions, interacting appropriately with the public, supervisors and co-workers and responding appropriately to work pressures and changes in a routine or usual work setting (Tr. 776-77); the limitations from Ms. Cuff or Dr. Trayer of deficits in anxiety, mood, and attention; or whether Plaintiff could still maintain employment if she missed work or had to leave early on a regular basis. Pl. Br. at 12-13, Doc. 11. The ALJ evaluated the record before determining Plaintiff's residual functional capacity.

### a. ALJ Review and Findings

"The claimant has the following severe impairments: Restless Leg Syndrome and Depression. 20 C.F.R. § 404.1520(c) and 416.920(c)." (Tr. 28).

"The claimant also alleged disability due to mental health impairments. Christopher Royer, Psy.D. examined the claimant, diagnosing her as having major depressive disorder. Dr. Royer assessed the claimant's GAF score at 52. The claimant's mental health impairments are discussed in greater length below." (Tr. 28-29).

"The severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.04. In making this finding, the [ALJ] has considered whether the 'paragraph B' criteria are satisfied. To satisfy the 'paragraph B' criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation

means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (Tr. 30).

"In activities of daily living, the claimant had mild restriction. The claimant alleged that she is depressed. She alleged that she has difficulty sleeping. She also alleged that she has difficulty remembering to perform activities of personal care. However, the claimant is able to perform household chores, including preparing light meals, washing dishes, doing laundry and cleaning. The claimant is also able to manage her own finances." (Tr. 30) (emphasis added).

"In social functioning, the claimant has moderate difficulties. The claimant alleged that she has difficulty getting along with others. She alleged that she does not go out socially. She alleged that she is unable to go out alone. However, the claimant reported that she spends time with others. She reported that she speaks to her father several times per week. She also reported that she talks to her brother every week." (Tr. 30) (emphasis added).

"With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant alleged that she has difficulty remembering, completing tasks and concentration. She also alleged that she has difficulty handling stress and changes in routine. However, the record indicates that the claimant's intelligence is average and her concentration, judgment and insight are good." (Tr. 30) (emphasis added).

"As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration." (Tr. 30).

"The limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process . . . Therefore, the following residual functional capacity assessment reflects the

degree of limitation the [ALJ] has found in the 'paragraph B' mental function analysis." (Tr. 31).

"After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b). The claimant is required to take normal breaks, including a 15 minute morning break, a 30 minute lunch and a 15 minute afternoon break, as well as 1 or 2 unscheduled breaks. The claimant is prohibited from pushing and pulling with her left lower extremity, as well as from climbing stairs, stooping and kneeling and she is prohibited from crouching or squatting. The claimant is limited to occasional exposure to extreme cold and extreme humidity and she is prohibited from concentrated exposure to fumes, dust, gases and poor ventilation. The claimant is prohibited from work in high exposed places and from working around fast moving machinery on the ground. The claimant is limited to performing unskilled work with occasional interaction with the public." (Tr. 31).

"The claimant alleged disability due to hypertension, cervical cancer, restless leg syndrome and depression. She alleged that she has difficulty lifting, squatting, bending, standing and reaching. She also alleged that she has difficulty walking, kneeling and climbing stairs. She alleged that she is only able to walk approximately 100 feet before needing to stop to rest. The claimant alleged that she has difficulty sleeping. She testified that she believes that there is a recurrence of cervical cancer. She also testified that her legs are jumpy. The claimant alleged that she has difficulty talking, remembering and completing tasks. She also alleged that she has difficulty concentrating and getting along with others. She alleged that she forgets to perform activities of daily living, including washing her hair and shaving. She alleged that she has difficulty handling stress and changes in routine. The claimant testified that she has difficulty focusing. She also testified that she does not finish what she starts." (Tr. 31-32).

"The claimant also has a history of mental health impairments, for which she has been treated. In August 2010, the claimant began treating at Franklin Family Services relative to anxiety and depression. Upon examination, it was noted that the claimant's mood is good and her affect is normal. It was also noted that the claimant's intelligence, concentration, judgment and insight are good. The claimant's GAF score was assessed at 70. The record indicates that the claimant continued to routinely follow up for psychotherapy and medication management. In October 2011, the claimant was noted as having high levels of stress and depression related to medical impairments and her GAF score was assessed at 40. However, throughout treatment, the claimant's GAF score has been assessed between 58 and 70. Further, the claimant's GAF score of 40 is indicative of an exacerbation of symptoms due to the claimant's external stressors, and as such, it is given little weight." (Tr. 32).

"Christopher Royer, Psy.D. performed a consultative examination of the claimant, noting that she has a history of depression. Dr. Royer noted that the claimant is exhausted and she has lost weight. Dr. Royer also noted that the claimant sometimes feels 'totally out of it.' However, upon examination, Dr. Royer observed that the claimant is pleasant and cooperative. Dr. Royer noted that she is fully alert and her speech is fluent. Dr. Royer also noted that the claimant's thought process is clear and her associations are appropriate. Dr. Royer noted that the claimant's judgment is fair and she is alert and oriented. Dr. Royer noted that while the claimant's learning and recall ability was mildly impaired, she performed mental arithmetic and serial three addition without difficulty. Dr. Royer assessed the claimant's GAF score at 52, which is indicative of no more than a moderate impairment." (Tr. 32-33) (emphasis added).

"As is discussed above, the record indicates that the claimant's GAF score has consistently been assessed between 58 and 70, which demonstrates the existence of an impairment which will produce mild to moderate symptoms. The [ALJ] gives significant weight to the aforementioned

assessments, as they were provided by the claimant's examining psychiatric practitioners. Further, the above discussed GAF scores are consistent with the objective findings noted throughout the record." (Tr. 33) (emphasis added).

"As for the opinion evidence, the State agency psychiatric consultant prepared a residual functional capacity assessment, noting that the claimant is able to understand and remember simple one and two step instructions and she is able to perform simple, routine, repetitive work in a stable environment. The State agency consultant also noted that the claimant is able to make simple decisions, maintain socially appropriate behavior and exercise appropriate judgment in the work place. The State agency psychiatric consultant also prepared a psychiatric review technique, noting that the claimant has a moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace. The [ALJ] gives significant weight to the State agency consultant's assessment, as it is consistent with the objective findings noted throughout the longitudinal record." (Tr. 33) (emphasis added).

"Dr. Royer also prepared a medical source statement, noting that the claimant is moderately restricted in her ability to understand, remember and carry out detailed instructions, as well as in her ability to make judgments on simple work related decisions. Dr. Royer also noted that the claimant has a marked restriction in her ability to interact appropriately with the public, as well as in her ability to respond appropriately to work pressures and changes in a routine work setting. The [ALJ] also gives limited weight to Dr. Royer's assessment, as it is inconsistent with the objective findings noted throughout the longitudinal medical treatment records." (Tr. 33) (emphasis added).

"The [ALJ] does not find the claimant to be entirely credible regarding the extent and severity of her impairments and limitations. The claimant's allegations have not been entirely consistent with

the objective findings, in that the treatment received by the claimant relative to her impairments has been routine and conservative in nature. Evidence contained within the records indicates that the claimant's medical treatment is limited almost entirely to routine follow up. There is no evidence contained within the record indicating that the claimant has sought any alternative form of medical treatment, including group therapy or inpatient hospitalization. Further, the claimant's subjective allegations are not supported by the objective findings of record. The claimant testified that she has difficulty focusing. She also testified that she cannot finish what she starts. However, the record indicates that the claimant's GAF score has consistently been assessed between 58 and 70. The claimant also testified that she continues to have difficulty related to restless leg syndrome, including difficulty sleeping. However, the record indicates that the claimant has not been seen for follow up treatment relative to restless leg syndrome since May 2011. Finally, the claimant has been non-complaint with prescribed medical treatment, specifically failing to receive B12 injections as she was instructed by Dr. Qazizadeh." (Tr. 34) (emphasis added).

"The combination of the claimant's severe and non-severe physical impairments, as well as the associated symptoms noted throughout the medical treatment records, supports the claimant's limitation to performing work at less than the full range of light exertional level with the requirement to take normal breaks throughout the workday. The claimant's restless leg syndrome and hypertension also supports the limitation prohibiting the claimant from pushing [ ] with her left lower extremity, as well as the limitation prohibiting her from climbing ropes, ladders, scaffolding and poles. The symptoms associated with the claimant's hypertension also supports the limitation to occasionally climbing stairs, stooping and kneeling. The claimant's physical impairments also support the limitation to occasional exposure to extreme cold and humidity, as well as the limitation prohibiting the claimant from concentrated exposure to fumes, dusts, gases and poor ventilation. The

claimant's anxiety supports the limitation prohibiting the claimant from working in high exposed places, as well as from working around fast moving machinery on the ground. The claimant's mental health impairments, as well as the associated symptoms noted throughout the medical treatment records, supports the limitation to performing unskilled work with no more than occasional interaction with the public." (Tr. 34) (emphasis added).

"In sum, the above residual functional capacity assessment is supported by the objective findings noted throughout the longitudinal medical treatment records." (Tr. 34).

### b. Summary of ALJ Findings

Plaintiff contends the ALJ erred in determining Plaintiff's residual functional capacity and question to the vocational expert by failing to include Dr. Royer's limitations of a marked restriction in interacting appropriately with the public and responding appropriately to work pressures or changes in a routine or usual work setting (Tr. 389); Kim Cuff's extreme restriction in understanding, remembering and carrying out short, simple instructions, making judgments on simple work related decisions, interacting appropriately with the public, supervisors and co-workers and responding appropriately to work pressures and changes in a routine or usual work setting (Tr. 776-77); the limitations from Ms. Cuff or Dr. Trayer of deficits in anxiety, mood, and attention; or whether Plaintiff could still maintain employment if she missed work or had to leave early on a regular basis. Pl. Br. at 12-13, Doc. 11.

From the review of the record, the ALJ throughly evaluated the record and found Plaintiff has the severe impairments of restless leg syndrome and depression, 20 C.F.R. § 404.1520(c) and 416.920(c); is able to perform household chores, including preparing light meals, washing dishes, doing laundry and cleaning; is able to manage her own finances; spends time with others; speaks to her father several times per week and talks to her brother every week; is average intelligence and her

concentration, judgment and insight are good; no episodes of decompensation; has the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b); is limited to performing unskilled work with occasional interaction with the public; began treating for anxiety and depression in August 2010 and her mood is good and affect normal, her intelligence, concentration, judgment and insight are good; has been assessed a GAF score between 58 and 70 and the GAF score of 40 is indicative of an exacerbation of symptoms due to external stressors, and as such, is given little weight; upon examination, Dr. Royer observed her pleasant and cooperative, fully alert, and speech fluent, Dr. Royer also noted thought process clear, associations appropriate, judgment fair, and alert and oriented, Dr. Royer noted that while Plaintiff's learning and recall ability was mildly impaired, she performed mental arithmetic and serial three addition without difficulty, Dr. Royer assessed her GAF score at 52, which is indicative of no more than a moderate impairment; GAF score has consistently been assessed between 58 and 70, which demonstrates the existence of an impairment which will produce mild to moderate symptoms, and the [ALJ] gives significant weight to the assessments, as they were provided by Plaintiff's examining psychiatric practitioners, and the GAF scores are consistent with the objective findings noted throughout the record; is able to make simple decisions, maintain socially appropriate behavior and exercise appropriate judgment in the work place according to the state agency consultant, moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 28, 30-33).

The ALJ further found the State agency consultant's assessment is consistent with the objective findings noted throughout the longitudinal record; limited weight accorded to Dr. Royer's assessment, as it is inconsistent with the objective findings noted throughout the longitudinal medical

treatment records; Plaintiff was not entirely credible regarding the extent and severity of her impairments and limitations; the allegations have not been entirely consistent with the objective findings, in that the treatment received relative to her impairments has been routine and conservative in nature; evidence contained within the records indicates the medical treatment is limited almost entirely to routine follow up; there is no evidence contained within the record indicating Plaintiff has sought any alternative form of medical treatment, including group therapy or inpatient hospitalization; Plaintiff's subjective allegations are not supported by the objective findings of record; Plaintiff testified she has difficulty focusing and cannot finish what she starts; however, the record indicates her GAF score has consistently been assessed between 58 and 70; Plaintiff's mental health impairments, as well as the associated symptoms noted throughout the medical treatment records, supports the limitation to performing unskilled work with no more than occasional interaction with the public; and in sum, the residual functional capacity assessment is supported by the objective findings noted throughout the longitudinal medical treatment records. (Tr. 33-34).

Plaintiff contends the ALJ erred in determining Plaintiff's residual functional capacity and question to the vocational expert by failing to include all of Plaintiff's limitations. Pl. Br. at 12-13, Doc. 11. Although Plaintiff argues there were medical records to support disability, the ALJ had substantial evidence for the decision, i.e., more than a scintilla, which is the standard on appeal. Plummer, 186 F.3d at 427.

### (1) Plaintiff's GAF Scores

Plaintiff references the GAF scores. Pl. Br. at 4, 14-15, 17-18, Doc. 11. Plaintiff also states the ALJ failed to make any specific finding on the weight given to Dr. Trayer's sub 50 GAF scores (Tr. Pg. 485, 797, 803). Plaintiff argues that if the Administrative Law Judge had a question about the GAF scores above and below 50, she was obliged to recontact the sources for clarification. Pl.

Br. at 14, Doc. 11. However, the ALJ did note Plaintiff's low GAF score.

"Dr. Royer assessed the claimant's GAF score at 52. The claimant's mental health impairments are discussed in greater length below . . . In October 2011, the claimant was noted as having high levels of stress and depression related to medical impairments and her GAF score was assessed at 40. However, throughout treatment, the claimant's GAF score has been assessed between 58 and 70. Further, the claimant's GAF score of 40 is indicative of an exacerbation of symptoms due to the claimant's external stressors, and as such, it is given little weight . . . Dr. Royer assessed the claimant's GAF score at 52, which is indicative of no more than a moderate impairment." (Tr. 28-29; 32-33).

The Diagnostic and Statistical Manual of Mental Disorders-IV, the source of the GAF scale, instructs that a GAF score is based on the symptom severity or level of functioning at the time of the examination. Courts within the Third Circuit have accepted the Commissioner's position that GAF scores are not dispositive of disability. See, e.g., Gilroy v. Astrue, 351 F. App'x 714, 716 (3d Cir. 2009) (explaining that a GAF score of 45 did not warrant remand given that no statement of specific functional limitations accompanied the score); Chanbunmy v. Astrue, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008).

"We further find no error with respect to the ALJ's evaluation of the Plaintiff's mental impairments in fashioning his RFC. The ALJ found Plaintiff was limited to simple, routine, repetitive tasks not involving fast pace or more than simple work decisions, and could have only incidental collaboration with coworkers and the public and collaboration with the supervisor for about 1/6 of the time. Plaintiff argues that the ALJ's RFC finding failed 'to encapsulate all of the limitations flowing from [his] severe mental illness' and contends that his low GAF score of 45 demonstrates a complete inability to work. The ALJ specifically rejected this GAF score assessed

by [the treating psychiatrist], however, as inconsistent with the remaining medical evidence. An ALJ

may properly reject a GAF score when it is inconsistent or unsupported by the record as a whole.

Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005); Blakey v. Astrue, 2010 WL 2571352 at

*11 (W.D. Pa. 2010)." Klein v. Colvin, No. 13-cv-1497, 2014 WL 2562682, at *11 (W.D. Pa. June

06, 2014).

 "Plaintiff next argues that the findings of consultative examiner [ ] were not properly credited

by the ALJ. The ALJ noted the marked and extreme limitations findings, and low GAF score,

assessed by [the consultative examiner] in his decision. The ALJ found—as did [the state agency

evaluator]—that these findings were inflated, and not an accurate representation of Plaintiff's mental

health history. In support of his position, the ALJ cited to Plaintiff's psychiatric treatment at Safe

Harbor between October 2009 and October 2010, which revealed a marked—and

sustained—increase in Plaintiff's GAF scores, as well as improved mental functioning. Observations

by [the consultative examiner] about Plaintiff's appearance were at odds with those at Safe Harbor,

as was the anomalous diagnosis of PTSD. Further, [the state agency evaluator] concluded based upon

her evaluation of the medical record, that [the consultative examiner's] findings were out of

proportion to what was found in Plaintiff's mental treatment history. Her limitations findings did not

exclude Plaintiff from finding work. The court, therefore, finds that the ALJ adequately supported

his decision to accord [the consultative examiner's] findings diminished weight with substantial

evidence from the medical record, particularly the lengthy treatment record from Safe Harbor, the

latter portion of which revealed significant improvement in Plaintiff's mental status. Lastly, to the

extent that Plaintiff argues that the ALJ erred in failing to accommodate [the consultative

examiner's] finding of marked limitation with respect to interacting with the public, the ALJ clearly

indicated that the work which Plaintiff could sustain would not include frequent interaction with the

Page 29 of 39

public. Specifically, the ALJ stated that 'the claimant has a need to avoid repetitive reaching, any climbing, and frequent interaction with the general public. As such, Plaintiff's argument is moot.' See Lamb v. Colvin, No. 12-cv-137, 2013 WL 5366260, at *10 (W.D. Pa. Sept. 24, 2013).

Similarly in this case, the ALJ weighed the evidence in the record and accommodated Plaintiff's depression impairment by limiting the residual functional capacity to a range of light exertion with the restriction to unskilled work.

### c. Case Law and Analysis

Plaintiff states she treated at the Sadler Clinic where it was noted on May 4, 2010 that Plaintiff had been depressed for the past six months, was tearful, sad, did not want to do anything or leave her house, couldn't sleep because her mind races and had no joy in anything (Tr. 381). Pl. Br. at 5, Doc. 11. Again in Plaintiff's reply, she states an individual may be functioning well and have a Global Assessment of Functioning score above 50 while they are receiving treatment, taking prescribed medication and not working. Pl. Br. at 1, Doc. 16.

The regulations require the ALJ to find that Plaintiff's disability is expected to last continuously for a year. To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A) (emphasis added). Thus, Plaintiff's mental impairments and inability to do activities must also meet the durational requirement.

"Plaintiff next argues that the hypothetical to the ALJ was critically deficient, in that it failed to acknowledge plaintiff's restrictions to handle and work with small objects with both hands, and also failed to acknowledge that medications that plaintiff was using would prevent him from

working. In view of the scarcity of medical evidence regarding plaintiff's dextral limitations, the ALJ did not err in omitting such limitations from the hypothetical question. See Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) ('We do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant . . . the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations')." Clark v. Astrue, 844 F. Supp. 2d 532, 547 (D. Del. Feb. 15, 2012).

"[T]he ALJ is not bound to accept every limitation that is found by a medical professional, but rather only the ones that she finds are credibly established by the record. See Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 147 (3d Cir. 2007). Contrary to Plaintiff's assertion, the ALJ did not err by incorporating into her RFC finding only those limitations which she found to be credibly established by the objective medical evidence and the Court finds that the ALJ's RFC determination as well as her ensuing hypothetical to the vocational expert both enjoy the support of substantial record evidence. Finally, the Court finds that the ALJ evaluated the medical opinion evidence properly and in accordance with the applicable rules and regulations and that substantial record evidence supports her evaluation. The ALJ gave a detailed explanation for why the medical source statements from the mental health providers were not given controlling weight the ALJ discussed at length her justification for why the medical source statements from Dr. Jahangeer and Ms. Walker were inconsistent with and contradicted by the other medical evidence of record, including their own notes and prior findings. The Court finds that the ALJ discharged her duty because she (i) demonstrated her consideration of all the relevant medical evidence, (ii) addressed the contradictory evidence in the record which conflicted with her findings, and (iii) explained why that contrary evidence was rejected or not given controlling weight. See Cotter, 642 F.2d at 705. Indeed, the overarching theme of the ALJ's decision was the complete lack of objective medical evidence which

corroborated or even tended to support Plaintiff's complaints of severely disabling impairments and the Court agrees with the ALJ's finding that such corroborating evidence was woefully lacking in the record. Plaintiff's subjective complaints were corroborated only by her own self-reports, which—for the reasons discussed by the ALJ—were not particularly credible. To that end, the Court finds that the ALJ's credibility determination is well-supported by the record and that Plaintiff's arguments to the contrary are completely unpersuasive, particularly given the minimal treatment record, the inconsistencies in the record that were highlighted and discussed by the ALJ . . . Accordingly, the Court concludes that substantial record evidence supports the ALJ's determination of non-disability." Stewart v. Astrue, No. 13–73, 2014 WL 29035, at *1, n.1 (W.D. Pa. Jan. 2, 2014).

Similarly in this case, the record does not support Plaintiff's assertions of disabling severity. Plaintiff's contentions of error are inconsistent with the objective evidence and activities of daily living. From the ALJ's extensive review, substantial evidence supports the weight accorded to the allegations and opinions of record.

Thus, the ALJ's RFC finding includes only "credibly established limitations" and not all impairments alleged by claimant, Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005). Accordingly, the ALJ relied on the record and testimony in determining Plaintiff's residual functional capacity, and the findings are supported by substantial evidence.

### d. Question to Vocational Expert

Plaintiff contends the ALJ's hypothetical question to the Vocational Expert ("VE") did not include all of Plaintiff's limitations. Pl. Br. at 2, 13-14, Doc. 11.

At the administrative hearing, the ALJ asked the VE whether jobs existed for a person of Plaintiff's age, education, and work experience, who could perform light work with additional limitations, including 1 or 2 unscheduled breaks, no pushing and pulling with her left lower

extremity, no climbing stairs, stooping, and kneeling; no crouching or squatting; occasional exposure to extreme cold and extreme humidity, no concentrated exposure to fumes, dust, gases and poor ventilation; no work in high exposed places and no working around fast moving machinery on the ground; and limited to unskilled work with occasional interaction with the public (Tr. 51-55). The VE responded that such a hypothetical person could perform the unskilled, light jobs of bakery worker (conveyor line), cleaner / housekeeper, and machine tender (laminating). The VE further testified that these jobs could be performed by an individual at the light level of exertion (Tr. 55-56).

Plaintiff argues that the ALJ's hypothetical question was problematic because it did not include the consultative examiner's findings that Plaintiff had a marked restriction interacting with the public and responding appropriately to changes in the work setting, and that it did not include Plaintiff's therapist's opinion that Plaintiff had "extreme restriction" in every category of work-related abilities (Pl.'s Br. at 12).

However, the ALJ partially accounted for Dr. Royer's limitation, in restricting Plaintiff to "occasional interaction with the public" in her residual functional capacity ("RFC") (Tr. 31-33); Dr. Royer's other limitation regarding responding to workplace pressure and changes was not supported by the mental health treatment records (Tr. 31, 33). Ms. Cuff's opinion that Plaintiff had extreme restrictions in every category of functionality was not supported by her own treatment notes and those of Dr. Trayer, her supervisor, nor were they supported by any other record evidence; thus, the ALJ need not have included them in her RFC assessment.

A hypothetical question must accurately portray the claimant's individual physical and mental impairments. Podedworney v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). However, a hypothetical question need reflect only those impairments that are supported by the record. Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004). The ALJ included all of Plaintiff's credible limitations

in the hypothetical question and the ultimate RFC assessment. Plaintiff's mental health treatment history provides substantial evidentiary support for the ALJ's finding that Plaintiff could perform unskilled work with so long as she could take extra breaks, and only occasional interaction with the public (Tr. 31). In this history, Plaintiff's treating mental health providers consistently assigned Plaintiff relatively high GAF scores and assessed her mental functioning as adequate.

Since the VE identified a significant number of unskilled, light jobs in the national economy that could be performed by a hypothetical individual with the same vocational profile and RFC as Plaintiff, substantial evidence supports the Commissioner's final decision that Plaintiff was not disabled under the Act. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (which provides that the testimony of a VE constitutes substantial evidence for purposes of judicial review where the hypothetical questioning of the ALJ fairly encompasses an individual's significant limitations that are supported by the record).

"Because the hypothetical posed to the vocational expert reflected claimant's RFC, and that RFC is supported by substantial evidence, the Court holds that the hypothetical was sufficiently accurate. See Covone v. Commissioner Social Sec., 142 Fed. Appx. 585, 2005 WL 1799366 (3d. Cir. July 29, 2005). As the ALJ's decision is supported by the testimony of the vocational expert, the decision is supported by substantial evidence and is, therefore, affirmed. See Plummer, 186 F.3d at 431." Robinson v. Astrue, No. 10–1568, 2011 WL 1485977, at *13 (W.D. Pa. Apr. 19, 2011).

Accordingly, substantial evidence supports the ALJ's hypothetical question, which included the limitations supported by the record.

### 3. ALJ Declined to Give Controlling Weight to Treating Psychiatrist

Plaintiff contends the ALJ erred in failing to give the Plaintiff's treating psychiatrist's opinion controlling weight. Pl. Br. at 6, 13-14, Doc 11. The ALJ reviewed the medical opinions in

conjunction with the medical evidence in the record.

The weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. 20 C.F.R. § 404.1527(c)(4). A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); Plummer, 186 F.3d at 429. If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to determine the weight to give the opinion. Id. The more a treating source presents medical signs and laboratory findings to support his medical opinion, the more weight it is entitled. Id. Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. Id. The Commissioner is not bound by a treating physician's opinion, and may reject it, if there is a lack of clinical data supporting it, or if there is contrary medical evidence. Lyons-Timmons v. Barnhart, 147 F. App'x 313, 316 (3d Cir. 2005).

The ALJ, not the treating or examining physician, must make the disability and residual functional capacity determination. 20 C.F.R. § 404.1527(d)(1)-(2); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356 (3d Cir. 2011). "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Chandler, 667 F.3d at 361; Coleman v. Astrue, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

The case law in this circuit makes clear that physician opinions are not binding upon an ALJ,

and that an ALJ is free to reject a medical source's conclusions. Chandler, 667 F.3d 356 at 361. In so doing, however, the ALJ must indicate why evidence was rejected, so that a reviewing court can determine whether "significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981). Mistick v. Colvin, No. 12-cv-1031, 2013 WL 5288261 (W.D. Pa. Sept. 18, 2013).

In Chandler, 667 F.3d at 362, the Third Circuit held that the district court had erred in concluding that the "ALJ had reached its decision based on its own improper lay opinion regarding medical evidence." Id. "The ALJ– not treating or examining physicians or State agency consultants –must make the ultimate disability and RFC determinations." Id. at 361 (citing 20 C.F.R. 404.1527(e)(1), 404.1546(c)).

The burden lies with Plaintiff to demonstrate harm from such error that would have changed the ALJ's decision, but he has not done so here. Shinseki v. Sanders, 556 U.S. 396, 409-10 (2009); see also Molina v. Astrue, 674 F.3d 1104, 1111, 1115-22 (9th Cir. 2012). "No principle of administrative law 'requires that we convert judicial review of agency action into a ping-pong game' in search of the perfect decision." Coy v. Astrue, No. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969)); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

#### 4. ALJ's Credibility Determination

Plaintiff contends the ALJ erred by discounting her credibility. Pl. Br. at 6, 16-18, Doc 8. The ALJ reviewed the record to evaluate Plaintiff's credibility.

When evaluating the credibility of an individual's statements, the adjudicator must consider

the entire case record and give specific reasons for the weight given to the individual's statements. SSR 96–7p, 61 Fed. Reg. 34483 (July 2, 1996). In particular, an ALJ should consider the following factors: (1) the plaintiff's daily activities; (2) the duration, frequency and intensity of the plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's prior work record; and (8) the plaintiff's demeanor during the hearing. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); Jury v. Colvin, No. 3:12-cv-2002, 2014 WL 1028439 (M.D. Pa. Mar. 14, 2014). When the Court reviews the ALJ's decision, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Walters v. Commissioner of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997) (citing Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.")). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The ALJ provided the reasons for discounting Plaintiff's credibility. "The [ALJ] does not find the claimant to be entirely credible regarding the extent and severity of her impairments and limitations. The claimant's allegations have not been entirely consistent with the objective findings, in that the treatment received by the claimant relative to her impairments has been routine and conservative in nature. Evidence contained within the records indicates that the claimant's medical treatment is limited almost entirely to routine follow up. There is no evidence contained within the

record indicating that the claimant has sought any alternative form of medical treatment, including group therapy or inpatient hospitalization. Further, the claimant's subjective allegations are not supported by the objective findings of record. The claimant testified that she has difficulty focusing. She also testified that she cannot finish what she starts. However, the record indicates that the claimant's GAF score has consistently been assessed between 58 and 70. The claimant also testified that she continues to have difficulty related to restless leg syndrome, including difficulty sleeping. However, the record indicates that the claimant has not been seen for follow up treatment relative to restless leg syndrome since May 2011. Finally, the claimant has been non-complaint with prescribed medical treatment, specifically failing to receive B12 injections as she was instructed by Dr. Qazizadeh." (Tr. 34).

Thus, the ALJ's decision was consistent with the medical evidence in the record and Plaintiff's testimony at the ALJ hearing. Accordingly, substantial evidence supports the ALJ's findings regarding Plaintiff's credibility.

## V.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971).

Case 3:12-cv-02120-GBC   Document 17   Filed 09/15/14   Page 39 of 39


Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. <u>Monsour Med. Ctr.</u>, 806 F.2d at 1190. Here, a reasonable mind might accept the evidence as adequate, and the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate order in accordance with this memorandum to deny Plaintiff's appeal will follow.

Dated: September 15, 2014
                                                   s/Gerald B. Cohn
                                             GERALD B. COHN
                                     UNITED STATES MAGISTRATE JUDGE